**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
KEVIN M. A.,                               :
                                           :
                  Petitioner,              :          Civ. No. 20-4593 (KM)
                                           :
         v.                                :
                                           :
THOMAS DECKER, *et al.*,                   :          **OPINION**
                                           :
                  Respondents.             :
_____    :

**KEVIN MCNULTY, U.S.D.J.**

**I.      INTRODUCTION**

Petitioner, Kevin M. A.,[1] is an immigration detainee currently held at the Bergen County Jail, in Hackensack, New Jersey. ICE seeks to deport him because he overstayed his visa. He has He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Respondents oppose the petition. (DE 7.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be granted insofar as it seeks a preliminary injunction requiring Petitioner's temporary release. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

**II.     BACKGROUND**

**A.     COVID-19**

On March 21, 2020, New Jersey Governor Philip D. Murphy issued a state-wide stay at home order in response to the ongoing pandemic caused by an infectious disease commonly

---

[1]       Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

referred to as COVID-19. N.J. Exec. Order No. 107 (Mar. 21, 2020), https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf. The order was enacted in an attempt to mitigate the spread and community transmission of COVID-19. *See id.* To date, this rapidly spreading disease has infected over one million people and has resulted in over 60,000 deaths within the United States. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 1, 2020). Currently, New York and New Jersey are two of the most heavily impacted states, with more than 294,000 and 116,000 cases respectively. *See id.* As of April 21, 2020, Respondents indicate that at Bergen County Jail, where Petitioner is detained, two immigration detainees have tested positive for COVID-19, four immigration detainees and one inmate are suspected to have COVID-19, and twenty four (24) corrections officers and four nurses have tested positive for the disease. (DE 7-8 at 6.)

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a respiratory illness that can spread "[b]etween people who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 1, 2020). The CDC states that "[t]he virus that causes COVID-19 is spreading very easily and sustainably between people." *See id.* Even those who do not show symptoms of the virus may be able to spread it. *See id.* Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 1, 2020). Certain groups of individuals are at "higher risk for severe illness from COVID-19." *See* Ctrs. for Disease Control and Prevention, *Groups at*

*Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 1, 2020). These "high risk" individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.* In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited May 1, 2020). Ultimately, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

According to the CDC, correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 1, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Thomas Decker, et al.,* Civ. No. 20-3600, ECF No. 26 at *3 (D.N.J. Apr. 12, 2020). It is against this backdrop that Petitioner filed the instant action.

**B.     Factual and Procedural Background of Petitioner's Case**

  *i.     Procedural History and Criminal Background*

Petitioner is a 25-year-old native and citizen of Angola. (DE 1 at 4; DE 7 at 12.) He arrived in the United States on or about December 15, 2015 pursuant to a B2 visa. (DE 7-10 at 3.) Petitioner did not leave the United States when his visa expired on June 14, 2016, however, and he has remained here since that time. (*Id.*) Petitioner has had some involvement with the criminal justice system; ICE does not contend, however, that he is deportable based on, e.g., conviction of an eligible crime; ICE seeks to remove him from the U.S. strictly on the basis of his having overstayed his visa. (DE 7-10)

On September 15, 2017, Petitioner was convicted of third-degree Attempted Assault with Criminal Negligence to Cause Injury with Weapon/Instrument, in violation of N.Y. Penal Law § 120.00. (DE 7-9 at 9.) He was sentence to an Order of Protection, with a term of sixty (60) days. (*Id.*) On February 12, 2020, he was arrested and later arraigned on the following charges: one count of second-degree Assault with Intent to Cause Physical Injury with Weapon/Instrument, in violation of N.Y. Penal Law § 120.05;  two counts of third-degree Assault with Intent to Cause Physical Injury, in violation of N.Y. Penal Law § 120.00; one count of second-degree Menacing with a Weapon, in violation of N.Y. Penal Law § 120.14; one count of fourth-degree Criminal Possession of a Weapon with Intent to Use, in violation of N.Y. Penal Law § 265.01; two counts of third-degree Attempted Assaulted with Intent to Cause Physical Injury, in violation of N.Y. Penal Law § 120.00; two counts of third-degree Menacing, in violation of N.Y. Penal Law

§ 120.15; and two counts of second-degree Harassment with Physical Contact, in violation of N.Y. Penal Law § 240.26. (*Id.* at 6.) These charges remain pending. (DE 7 at 13.)

On February 14, 2020, Petitioner was taken in custody by Immigration and Customs Enforcement ("ICE"). (DE 7-10 at 6.) He is detained pursuant to 8 U.S.C. § 1226(a). (*Id.* at 7.)

On April 21, 2020, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 seeking immediate release from custody. (DE 1.) On April 24, 2020, Respondents filed opposition to the motion. (DE 7.) Petitioner thereafter filed a reply. (DE 10.)

ii.      *Petitioner's Health*

Petitioner indicates that he has been experiencing symptoms consistent with those of COVID-19, including fever and chest pains. (DE 1 at 1.) Petitioner's medical records from Bergen County Jail show that on April 8, 2020, he submitted a sick call slip complaining of chest pain, sweating, a headache, and trouble breathing. (DE 7-1 at 33.) On April 9, 2020, he received a chest x-ray and an EKG test which both appear to have come back with normal results. (DE 7-1 at 35-37; DE 7-2 at 47-48.) A doctor also ordered Petitioner to obtain an Influenza A & B screening, labs, and urinalysis. (DE 7-2 at 50-52.)

On April 13, 2020, Petitioner again submitted a sick call slip complaining that his symptoms were getting worse. (DE 7-1 at 31.) On April 14, 2020, Petitioner was transferred to unit "N2" and placed into quarantine for COVID-19. (*Id.* at 27; DE 7-2 at 43-45.) His medical chart states "POSSIBLE COVID 19 SYMPTOMS" and provides that Petitioner presented that day with a temperature of 99.9, watery eyes, chills, general malaise, and a reported cough. (*Id.* at 43-44.) He was prescribed Tylenol Extra Strength, Mucinex, and Medi-Phenyl. (*Id.* at 43.)

Petitioner was thereafter monitored daily. (DE 7-3 at 2-21.)[2] From April 15, 2020 through April 21, 2020, the last day for which a medical report is provided, Petitioner's chart indicates that he did not have a fever or shortness of breath. (*Id.*) The chart indicates that Petitioner's lungs were clear, and he was informed on multiple occasions to contact the medical department if any issues occurred. (*Id.*) Petitioner states that despite his symptoms, he has not been tested for COVID-19. (DE 10 at 12.)

With regard to his health, Petitioner has provided a statement by Dr. Laura Krinsky, who reviewed Petitioner's medical records from his time at Bergen County Jail. (DE 10-1.) Dr. Krinsky states that Petitioner has exhibited symptoms consistent with COVID-19. (*Id.* at 1.) She indicates that, based upon her review of the records, Petitioner is "at an increased risk of severe illness from COVID-19." (*Id.* at 2.) She states that the medical records demonstrate that Petitioner suffers from hypertension and that he has a low white blood cell count. (*Id.* at 2.) Individuals with hypertension have a higher probability of developing severe disease from COVID-19 and, in several large studies, "hypertension was independently associated with increased in-hospital mortality." (*Id.*) A low white blood cell count is also associated with "severe COVID-19 disease and death." (*Id.*) Dr. Kinsky states that it is "concerning" that Petitioner's low cell count has not been "interpreted, trended over time, nor is a follow-up blood test performed to specify what type of WBC is low[.]" (*Id.*) Dr. Kinsky also provides that preliminary data indicates that Petitioner, as a "black male," is part of a social group which also puts him at increased risk of severe COVID-19 disease. (*Id.*)

Dr. Kinsky opines that "[d]etention care environments result in delay in case, which in . . . cases of confirmed or suspected COVID-19 infection could be deadly." (*Id.* at 1.) She further

---

[2]    The last notation in Petitioner's chart is on April 21, 2020. (DE 7-2 at 20-22.) It appears that Petitioner's medical records were provided on April 22, 2020, so it is unclear whether Petitioner still been monitored daily since April 21, 2020.

submits that Petitioner "would be able to access care more readily [in a community setting], especially with the rapid expansion of community providers available through telehealth, urgent care centers, ambulatory testing sites, as well as clinics and hospitals." (*Id.* at 3.) Moreover, Dr. Kinsky provides that "[a]fter reviewing this case as a doctor who has treated many patients in primary and acute care settings, I do not think that the care needs can adequately be addressed while in detention." (*Id.*)

### C.   Bergen County Jail's COVID-19 Protocols

To describe the measures the Bergen County Jail has implemented to combat the spread of COVID-19, Respondents provide the declaration of Steven Ahrendt, the warden of the facility. (DE 7-8.) Mr. Ahrendt states that the facility is adhering to CDC guidance. (*Id.*) The jail has increased its general cleaning and all housing units are being sanitized no less than four times per day. (*Id.* at 5.) The jail is providing disinfectant spray, hand sanitizer, and soap in every housing unit, and is encouraging staff, inmates, and detainees to use these tools "often and liberally." (*Id.*) The jail is providing education to all staff, inmates, and detainees on proper protocols to prevent the spread of COVID-19 and has posted signs throughout the facility reiterating these protocols in both English and Spanish. (*Id.*)  Mr. Ahrendt states that all staff, inmates, and detainees have been issued surgical masks to wear around the facility. (*Id.* at 3, 6.)

Due to COVID-19, the facility is currently on lockdown and all inmates and detainees remain in their cells except for 60 minutes per day. (*Id.* at 3.) The facility has staggered the 60-minute time periods so that only six inmates and detainees are permitted to leave their cell at a time. (*Id.* at 3-4.) Thus, the inmates and detainees have ample room for social distancing when they are outside of their cells. (*Id.* at 4.) All meals are eaten inside the cells so that inmates and detainees do not congregate. (*Id.* at 5.) Social visitation and facility tours have been suspended,

except for attorney visits which are limited to non-contact visits. (*Id.* at 3.) All staff and vendors receive medical screening each time they enter the facility, and as of March 13, 2020, Bergen County Jail is no longer accepting ICE detainees. (*Id.*)

If an inmate or detainee exhibits symptoms of COVID-19, they are immediately evaluated by medical staff. (*Id.* at 4.) If an inmate or detainee tests positive for COVID-19, they are isolated in a cell in the "North 2 housing unit," unless they require hospitalization. (*Id.*) The North 2 housing unit is being used exclusively for inmates and detainees who have tested positive for COVID-19 and those who are symptomatic and awaiting test results. (*Id.*) Those who have confirmed COVID-19 are kept on one side of North 2, while suspected positives are kept on the other side of North 2. (*Id.* at 4-5.) Each individual in North 2 has their own cell with a toilet and a sink. (*Id.* at 5.) As of April 21, 2020, there were four detainees who were symptomatic and one county inmate who was symptomatic. (*Id.*) They were the only individuals residing in North 2 at that time. (*Id.*)

If an inmate or detainee has had exposure to a confirmed case of COVID-19, but is asymptomatic, they are "cohorted" with other asymptomatic individuals. (*Id.*)[3] Cohorted inmates and detainees remain in the same housing unit for a period of 14 days. (*Id.*) If, after 14 days, no new cases develop, then cohorting is discontinued. (*Id.*)

Despite Mr. Ahrendt's assertions, Petitioner contends that the measures undertaken at the Bergen County Jail to combat the spread of COVID-19 are not being implemented as Respondents suggest. (DE 10 at 17-18.) Petitioner provides the declarations of multiple individuals who were

---

[3]     The CDC defines cohorting as "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/ guidance-correctional-detention.html (last visited May 1, 2020).

recently released from Bergen County Jail, as well as the declaration of the Attorney-in-Charge of the New York Immigrant Family Unity Project at the Brooklyn Defender Services, who is familiar with the conditions at the jail during the current pandemic. (DE 10-3; DE 10-4; DE 10-5; DE 10-6.) The declarations indicate that the staff at the Bergen County Jail have been slow to respond to requests for medical assistance and have not provided any special attention to individuals who are at higher risk of severe illness due to COVID-19. (DE 10-3 at 2; DE 10-4 at 7; DE 10-5 at 8; DE 10-6 at 8.) Some accounts state that even individuals exhibiting symptoms are not being treated. (DE 10-5 at 8; DE 10-6 at 8.)

The declarations further provide that that social distancing is not enforced while individuals are outside of their cells, and that commonly touched surfaces, such as phones and showers, are not being disinfected between uses. (DE 10-3 at 2; DE 10-4 at 5; DE 10-5 at 7; DE 10-6 at 8.) There is an alleged lack of adequate cleaning supplies, with some former detainees stating that there was no soap or hand sanitizer provided to them at all. (DE 10-3 at 2; DE 10-4 at 5-6; DE 10-5 at 8; DE 10-6 at 7.) Some staff members walk around the facility and bring detainees their food without wearing their protective face masks. (DE 10-4 at 6; DE 10-6 at 8.) And, the former detainees indicate that they were never educated on how to protect themselves from COVID-19. (DE 10-4 at 5-6; DE 10-5 at 6; DE 10-6 at 6.)

### III.    LEGAL STANDARD

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). Accordingly, this Court has jurisdiction over

Petitioner's claims as he is detained within this district and alleges that his detention violates the Constitution.

The petition seeks Petitioner's immediate release from custody. (DE 1 at 37-38.) I construe this as Petitioner's request for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). In order to obtain a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## IV.    DISCUSSION

The petition asserts two due process claims for habeas relief: (1) that the conditions of Petitioner's confinement amount to punishment; and (2) that Respondents have failed to provide

Petitioner with adequate medical care. (DE 1 at 36-37.) Petitioner alleges that these violations warrant his immediate release from detention. (*Id.* at 37-38.) Under the unique set of circumstances presented in this case, I find that Petitioner has met the standard for a preliminary injunction.

## A.     Likelihood of Success on the Merits

### i.     *Conditions of Confinement Claim*

At the outset, I note that Respondents appear to challenge Petitioner's ability to raise a conditions of confinement claim through a § 2241 petition. (DE 7 at 25.) The Supreme Court has "left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). Federal courts, however, have seemingly condoned challenges to conditions of confinement raised through a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Further, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Therefore, I find that Petitioner here may raise his conditions of confinement claim through the instant petition.

With respect to the substantive merits of his claim, Petitioner argues that the conditions of his confinement are impermissibly punitive given his medical vulnerabilities, current symptomatic illness, and Respondent's inadequate measures to combat COVID-19. (DE 10 at 20.) Petitioner asserts that his continued detention given these circumstances cannot be viewed as reasonably related to a legitimate government interest. (*Id.* at 20-21.) Respondents argue, however, that the measures undertaken by the Bergen County Jail to protect individuals from COVID-19 undercut Petitioner's constitutional claim. (DE 7 at 25.) Respondents emphasize that the Fifth and Eighth Amendment require Respondents provide safe and sanitary conditions to those within their custody, but that this requirement is not a guarantee against any injury or infirmary. (*Id*. at 26.) Respondents further argue that Petitioner's medical records reveal that he does not have a fever, respiratory distress, cough, or other symptoms consistent with COVID-19. (*Id.* at 23.)

Unlike convicted prisoners whose condition claims arise under the Eighth Amendment, pretrial and immigration detainees are entitled to heightened protections. *See Bell v. Wolfish*, 441 U.S. at 535-36; *see also Sharkey*, 928 F.3d at 306-07. Thus, an immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment. *See Sharkey*, 928 F.3d at 307. Under the Due Process clause, "a detainee may not be punished prior to an adjudication of guilt." *See id.* In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).[4]

---

[4]    The Court also takes into consideration the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993). In *Helling*, the Court found that a prisoner successfully asserted a conditions of confinement claim based upon exposure to environmental tobacco smoke, despite the fact that he was asymptomatic, because the Eighth Amendment protected against "sufficiently imminent dangers[.]" *See id.* at 34-35. The Court determined that the Eighth Amendment requires individuals be provided with basic human needs, which includes "reasonable safety," and that it would be "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *See id.* at 33 (internal quotation marks and citation omitted). *Helling* recognized that inmates are entitled to relief where they prove risk of exposure to serious contagious illnesses.

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33.

    Although *Helling* does not deal with the applicable legal standard for an immigration detainee's conditions of confinement claim, it nevertheless supports Petitioner's proposition that exposure to an infectious disease may constitute an unconstitutional condition of confinement.

In the emerging case law that has developed within this district, courts have emphasized certain key factors in determining whether an immigration detainee's conditions of confinement amount to punishment during the current pandemic: namely, the detainee's health and the specific conditions at the facility at which he is detained. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020)*; Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *7-8 (D.N.J. Apr. 9, 2020). In the absence of guidance from the Supreme Court or the Courts of Appeals regarding how to handle conditions of confinement claims during a pandemic, "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020).

In *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020), the Court found that although the government had a legitimate objective in "preventing detained aliens from absconding and ensuring that they appear for removal proceedings," the "unsanitary conditions" and "high risk of COVID-19 transmission" were not rationally related to that objective. *See id.* at *8. The Court explained that "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19" and that the petitioners had shown that, "despite their best efforts, they cannot practice these effective preventative measures in the Facilities." *See id.* The Court found Respondent's legitimate governmental objective was weakened in particular by the other options ICE had to monitor detainees that did not require their confinement. *See id.*

In *Rafael L.O.*, the Court also concluded that Respondents had a legitimate governmental objective in preventing detainees from absconding, but that the conditions of the prison, the current global pandemic, and the medical vulnerabilities the petitioners suffered from, resulted in conditions of confinement that were tantamount to punishment. *See Rafael L.O.*, 2020 WL 1808843, at *7-8. The Court found that "Respondents [did not] have an express intent to punish Petitioners," but that "such intent is not a necessary prerequisite." *See id.* at *7.

Additionally, in *Cristian A.R.*, which dealt with multiple detainees who were also confined at Bergen County Jail, the Court held that the totality of the circumstances compelled a finding that the conditions of confinement amounted to punishment. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *21. Although the Court found that the protocols Respondents implemented to prevent the spread of COVID-19 were "laudable," the Court ultimately determined that these enhanced measures were insufficient. *See id.* at *22.

Given these considerations, I find that circumstances in the instant case appear unduly punitive. Petitioner's underlying health conditions, namely his hypertension and low white blood cell count, place him in a category of individuals at higher risk for severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 1, 2020). Since there is currently no cure or vaccine for COVID-19, the only way individuals can protect themselves is through avoiding close contact with others, washing their hands often with soap and water, and by cleaning and disinfecting commonly touched surfaces. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 1, 2020). Although the Bergen County Jail has undertaken significant steps to try and prevent

the spread of the virus, the declarations Petitioner submitted indicate that these measures are not being implemented as directed and that some measures may be inadequate to protect high risk individuals such as Petitioner. For example, while Mr. Ahrendt's declaration stated that individuals are being encouraged to use soap and hand sanitizer "liberally and often," the declarations of the recently released detainees state that there was either not enough soap and hand sanitizer for them to clean their hands regularly, or that there was none at all. (*Compare* DE 7-8 at 5, *with* DE 10-3 at 2; DE 10-4 at 5-6; DE 10-5 at 8; DE 10-6 at 7.) Mr. Ahrendt stated that the facility has increased their cleaning to no fewer than four times per day; however, the former detainees submit that commonly touched surfaces such as telephones and showers were not being disinfected in between uses. (*Compare* DE 7-8 at 5, *with* DE 10-3 at 2; DE 10-4 at 5; DE 10-5 at 7; DE 10-6 at 8.) Moreover, although Mr. Ahrendt states that staff and detainees have been provided with protective face masks, the former detainees aver that staff members do not always wear those masks. (*Compare* DE 7-8 at 3, 6, *with* DE 10-4 at 6; DE 10-6 at 8.)

I raise these factual matters only as an indication that, despite the best intentions and efforts under trying circumstances, issues may continue to exist. It is not necessary to resolve them because my decision will rest primarily on the petitioner's medical condition (which does not seem to be disputed) and the danger to his health in an institutional setting.

I do not find that Respondents have an express intent to punish Petitioner, and I recognize that Respondents have a legitimate governmental objective in "enforcing immigration law, protecting the community . . ., and preventing [Petitioner] from absconding. (DE 7 at 33.) However, I do find that the conditions of Petitioner's confinement are excessive in light of that purpose under the current circumstances. *See Bell*, 441 U.S. at 538. This especially true given the existence of the available alternatives to Petitioner's confinement. *See Thakker v. Doll*, Civ. No.

20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("We note that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)). Accordingly, I find that Petitioner has shown a likelihood of success on the merits on his conditions of confinement claim.

  ii. *Inadequate Medical Care Claim*

 Petitioner's second cause of action alleges that Respondents have failed to address his urgent medical needs and to provide protection to individuals, such as Petitioner, who are at high risk of serious harm from COVID-19. (DE 1 at 37.) Petitioner argues that these failures demonstrate Respondents' deliberate indifference to his serious medical needs. (*Id.*; DE 10 at 25-26.) Respondents respond that the Bergen County Jail has provided Petitioner with a reasonably safe detainment environment and with appropriate medical care. (DE 7 at 29-30.) Moreover, Respondents contend that even if Petitioner disagrees with the type of medical care he has received, such disagreement does not justify his release through a preliminary injunction or habeas petition. (*Id.* at 29.)

 Even assuming that Petitioner could raise an inadequate medical care claim in a § 2241, I find that Petitioner has not shown a likelihood of success on the merits of this claim. Indeed, the prison authorities seem to have responded to the Petitioner's medical complaints humanely and professionally.

 The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020).

Thus, to succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 105-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The Third Circuit has found deliberate indifference in situations where: "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017). Notably, mere disagreement as to proper medical treatment is generally insufficient to establish deliberate indifference. *See Moore v. Luffey*, 767 F. App'x 335, 340 (3d Cir. 2019); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987); *Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *3 (D.N.J. Apr. 21, 2020).

Here, although Petitioner alleges that Respondents should have implemented specific measures to identify and protect individuals who are at high risk of complications from COVID-19, Respondents' actions indicate that they did, indeed, undertake numerous measures to protect detainees from contracting the virus. Bergen County Jail has taken numerous affirmative steps to try and stop the spread of COVID-19. (DE 7-8.) The facility has attempted to increase general cleaning of the jail, provide staff and detainees with masks, and allow room for detainees to practice social distancing when they are outside of their cells. (*Id.*)

The facility has also implemented protocols for individuals who exhibit symptoms of COVID-19. (*Id.*) Indeed, Petitioner's medical records demonstrate that since he presented with

symptoms of COVID-19, he has been monitored daily and prescribed medication to alleviate his symptoms. (DE 7-1; DE 7-2; DE 7-3.) Petitioner's medical records reflect that he has been advised on numerous occasions to alert staff if his symptoms worsen. (DE 7-3.) These actions do not demonstrate that Respondents have recklessly disregarded the substantial risk of harm that COVID-19 poses or refused to provide medical treatment. Accordingly, Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim.

While Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim, he has demonstrated a likelihood of success on his conditions of confinement claim.   Therefore, I find that Petitioner has met the first factor required for the grant of a preliminary injunction.

## B.    Irreparable Harm

The second threshold showing Petitioner must make in order to be granted a preliminary injunction is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Within Bergen County Jail, the evidence indicates that Petitioner may not be able to adhere to the measures which the CDC has "touted as the most effective means to thwart the spread of the virus." *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *25-26 (quoting *Rafael L.O.*, 2020 WL 1808843, at *8). Given Petitioner's underlying medical conditions, he remains particularly vulnerable to developing severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 1, 2020). Thus, it is clear that Petitioner is more likely than not to suffer irreparable harm if his confinement at Bergen County Jail continues under the present conditions.

**C.      Balancing of the Equities**

Lastly, I consider the remaining two factors: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. Respondents assert that Petitioner's criminal history militates against his release and poses a threat to public safety. (DE 7 at 32.) To underscore this point, Respondents state that ICE has voluntarily released dozens of detainees across its New Jersey facilities, but not individuals, such as Petitioner, who have "dangerous criminal histories." (*Id.* at 33.) Petitioner contends, however, that he faces serious illness or death if exposed to COVID-19 in a jail setting and that his infection would more likely than not harm others within the facility. (DE 10 at 27.)

Petitioner further states that his arrests do not justify his continued detention. He has only been convicted of one misdemeanor charge, for which he has completed his sentence. This Court is not in the business of setting bail for his pending charges; the court in which they are pending has released him on his own recognizance. (*Id.* at 28) ICE does not contend that he is deportable based on any criminal conviction; rather, his is a simple case of overstaying a visa. Petitioner represents that if he is released from ICE custody, he will return to living with his cousin in Brooklyn, where he will be able to self-isolate, social- distance, and access adequate care for his medical conditions. (*Id.* at 29.)

For the reasons explained above, there remains a significant possibility of harm to Petitioner if he remains detained at the Bergen County Jail under the present circumstances. His underlying medical conditions have been identified by the CDC as placing him at higher risk of developing severe illness from COVID-19. However, I am cognizant of the fact that Respondents have a legitimate interest in ensuring Petitioner does not abscond and in protecting the public.

I believe that Respondents' interests and Petitioner's interests can be appropriately balanced by releasing Petitioner to strict conditions including home confinement, as well as electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion. Thus, in balancing each of these factors, I find that they favor the grant of a preliminary injunction.

## V.    CONCLUSION

For the foregoing reasons, the petition (DE 1) will be granted insofar as a preliminary injunction shall be issued. An appropriate Order accompanies this Opinion.

DATED: May 1, 2020

/s/ Kevin McNulty

_____
KEVIN MCNULTY
United States District Judge